v. Shadwick King, Defendant Appellant. Arguing for the appellant is Ms. Kathleen T. Zellner. Ms. Zellner. Arguing for the appellee is Mr. Miles J. Kelleher. Ms. Zellner. All right. Are both sides ready to proceed? Mr. Kelleher. Yes, Your Honor. Ms. Zellner. And you are as well? Ms. Zellner. Yes. Ms. Zellner. Then, counsel, when you're ready. Ms. Zellner. May it please the Court, I am Kathleen Zellner, and I'm here on behalf of the Appellant Shadwick King. Also, I want to acknowledge counsel, Mr. Kelleher, and our audience. As the Court knows, you're very familiar with this case because of the opinion that you rendered in 2018, and then it went to the Supreme Court. The case that was presented for the second trial was a very different case in terms of the evidence. There was new evidence presented, both from a cell phone expert, a microscopist, a trace expert, a cardiac electrophysiologist, triple board certified, a triple board certified toxicologist, emergency medicine expert, and then new findings by Dr. Bloom. And that brings me to the first issue in the case, because this time it was a bench trial, and there is a presumption that the trial court considered competent evidence. And that presumption can be rebutted if it can be demonstrated that mistakes were made by the court or the court failed to consider evidence. And so our first Mr. Kelleher. The presumption is that the court considered all of the evidence, even evidence that's not referenced by the trial court. As a reviewing court, we review the entire record, correct? Correct, Your Honor. It would be a de novo review. Why is it a de novo review? Because it would be a de novo review if we can demonstrate, if we can demonstrate that the presumption that the court considered competent evidence has been rebutted. So that takes us to Where in the record is there evidence that trial court rejected or misunderstood the crux of the defense case? That was what I was now going to present with the new evidence, Your Honor. The first mistake the court made was they did not consider the cell phone expert testimony. The court stated that there were four experts that testified. And of course, we have a written opinion. There were actually five experts that testified. And what the cell phone expert testified to, and he was unrebutted. The state had no one to rebut him. He set the time frame of this incident by identifying a cell phone ping at the King home, in the vicinity of the King home at 623. Then he identified, and it's Mrs. King's phone, a cell phone ping at 634 in the vicinity of the railroad tracks. He put up an example of exactly the range that cell phone ping was in. That's 11 minutes. How far from the defendant's home was Kate's body found? It's approximately a quarter of a mile, 1,250 feet. Short distance. Short distance, but very unlikely that a body of a deceased person weighing almost 150 pounds could be carried in broad daylight, 630 a.m., with people out and about, walking their dogs or whatever. I think you make the point in your brief, and I think you did in the trial court, that no neighbors saw the defendant, didn't see. But no one saw Kate either, right? That's correct, Your Honor. That's right. And everything happened, occurred within a pretty short window of time in terms of what we know, because the first train passes and 6 will wait, doesn't see the body. The next train comes by less than a half hour later, and there she is. Or about a half hour later. That's right. At 638, the second train comes, and she's lying there on the north side of the tracks. But that makes the cell phone ping really important, because it's the location. But the fact that the trial court did not comment on it doesn't mean that we have to, you know, do a de novo review. That's one of about six points I was going to make. But I just want to illustrate the significance of that, because that is when she's either walking over to the tracks, 11 minutes to get to that spot. Or he is. Or he's transporting her. Or he is, right. Exactly. But here's the problem with the cell phone expert. We know exactly where the body's found. The cell phone ping is east of where the body's found, and the access point 2 is right where the body is. So that would mean that he would have driven his vehicle over, and there's no evidence. No tire tracks. It was muddy. The police vehicles all have tire tracks. There's not a shred of evidence that a vehicle was driven to access point 2. 3 and 1 can't be accessed by a vehicle. You mentioned the mud.  The paramedics that were on the scene, and I think one of the officers all testified that their shoes were muddy. Yes. Got muddy. Kate's shoes are dry. They're dry, but the trace expert found. But there's no mud. There's no mud. But that's because she went through over the grass. That's why she has a blade of grass. That's pure speculation. And she went, no, there's a blade of grass under the shoe. Pardon? There's a blade of grass that the trace expert identified. But let me just finish on the cell phone ping. There is no reason he would have taken this dead body and instead of depositing it where it's found, walk all the way back east, make a U-turn, and come back and lay it on the ground. And he's got four minutes to do it because the ping is at 634. So in four minutes, he's got to walk down there where the ping is, turn around, come back, position her body, tuck her arm under, put her head a certain way, and escape with no one seeing him, including the train engineers, which are on a straight track coming down the track. That's why they see the body.  Counsel, before you move on, the 634 ping. Yes. It's a much wider range. 60 meters. Right. But it's still 200 feet east of where the body is. So there's... Was that marked on any exhibit? Yes, it was. Yes, it is marked in the trace expert exhibit.  So yeah, I've got the one marked with the range. Right. I don't see a marking as to the body location on the range exhibit. I believe it was on there, but the body is 200 feet west of where the ping is. So that is important that the judge overlooked it. Your time is kind of limited, so we're familiar with the record.  All right, trace evidence. I want to ask you this about the defendant's statement, his statement to Curt. He tells Curt that they had a fight. They were fighting, and Kate went on a run to clear her head. Correct? That was Curt's testimony. That was Curt's testimony. That wasn't Mr. King's testimony. Let me ask you this. That identical language was used by the defendant when he was interviewed by Detective Peck. He said, Kate told me she's going for a run and that she went for a run, quote-unquote, to clear her head. No, actually, he said they didn't speak to each other before she left, okay? Well, you're talking about a different statement in his testimony. I'm talking about his recorded statement. Okay, he's guessing. He doesn't know where she's going. He knows she's left the house. The language that he used is identical. What he said to Curt is identical to what he said to Peck. Yes, but it doesn't make any difference because he's just guessing. He doesn't see her go out. Nobody, there's no verification that she didn't go for a walk. He told Peck that she said to him that she told him that she's going for a run. That may be, that may be. That's a quote. My understanding and the consistent testimony has been that he's always claimed that he saw her starting to get dressed in jogging clothes. That was his testimony. Well, it was in several different places. His second statement on July 8th. He's still speculating. Okay, and he, would you agree that in looking at the evidence that a defendant's false exculpatory statements can provide an inference of guilt? I would agree to that proposition, but it doesn't apply in this case.  Because he's purely speculating that she went for a run. It doesn't mean anything. It doesn't mean he dressed her, he strangled her, he killed her. What about the other statements? When he tells Peck that he called Kehoe and told him to leave my wife alone. But he doesn't say anything about the, you know, sexual innuendo text that he. All of the sexual innuendo texts came in and he testified to them. And they were all put in the most humorous way. And at the end he said, I'm so sorry, I'm drunk, forgive me. I mean, if you can look at those texts and think that. Not only that, he adds time to his, in his second statement, I went down by the river. He admits that he went to the bank. The judge completely confused. Even though he knows, and the police tell him, we're tracing what was going on. The time, the time frame on that is totally mixed up by the judge. And it's not relevant to the forensic evidence in this case. Because the second thing this judge confused was the trace evidence on her shoes. She's got rust and steel particles from the rail. And most significantly, she has a scuff mark right by her little toe as she's going west. And so she had an event out there. And the shoes are abraded unevenly. She was walking on the ballast rocks. She was alive when she was there. And another thing I want to correct from the prior case is even the Supreme Court thought that pulseless electrical activity, PEA, occurred after death. It doesn't. It occurs before death. And she had PEA. And the cardio-electrophysiologist testified that she had an organized rhythm and 40 beats of her heart on the railroad tracks. Well, the state's case was she was strangled in a couple minutes at her home and suffered a brain death. She did not. She was alive and she walked there. Ms. Zellner, that's your contention. And it's not a matter of whether or not your theory has some foundation in the record. The law requires us, as a reviewing court, to provide all reasonable inferences in the state's benefit. All reasonable inferences. And as the Supreme Court said, there was ample evidence, circumstantial evidence, to support the conviction. And Dr. Calicard's testimony that Kate was strangled was sufficient. That evidence was sufficient. And you did a nice job presenting evidence. But all reasonable inferences must be found in favor of the state? Judge, you're referring to the sufficiency standard, which is our second issue. Our first issue is that the judge made affirmative mistakes that are in this record. And the second mistake he makes— Where in the record does the court say, I don't believe this or I reject that? Your Honor, he makes a mistake on the trace evidence. He says she was dragged. She wasn't dragged. It was a scuff mark. The officers testified— The expert admitted on cross-examination that that trace evidence could have been there before she was placed under trace. He said that—no, he did not. He said that he thought that the combination of the metal flex from the train, the rust in the—also off of the rail in the scuff mark, it did not make it probable it was from anywhere else because their hypothetical was she'd walked downtown in Geneva. He said there's no cement. There's no—there's nothing that shows those shoes were anywhere else. But also, she had walked on ballast rocks. And that's why the soles of her shoes had the uneven wear pattern on them. So he also misstated that there were drag marks on her shoes. No one testified to that. And that was specifically refuted by our expert. And the police at the scene said there were no drag marks. Nothing was disturbed. So you still got an event that in four minutes our client has to have gotten her up there, made his U-turn with his big heavy body, put her down, staged her. And there isn't one forensic finding on her body except an inner arm bruise that the pathologist, Dr. Calicar, didn't concede was related to the tracks and her collapse on the tracks. There's no evidence. There's no evidence on her throat. There's no evidence on her mouth. There's no evidence she was strangled. And Dr. Calicar in this case stepped way back. She denied ever saying this was a manual strangulation. That's what the Supreme Court thought she said. She said, no, I'm not saying that. I'm saying it's an asphyxial death with compression of the neck and the chest. And then she's totally contradicted by the expert they brought in, Dr. Smock. The Supreme Court said here the state's case included Dr. Calicar's expert medical opinion that Kathleen's death resulted from manual strangulation. Exactly. And she denied that in the second trial. She denied it. Where did she deny it? There's no evidence of manual strangulation. No, she denied it. What about the petechial hemorrhaging that Dr. Roon kind of discounted? Well, everyone would discount it. Calicar and Smock, those are nonspecific findings. You could cough and get petechiae in your eye or in your throat. And her tongue is taken out by an assistant. So there are two hemorrhages at the back of the tongue. There are none of the classic findings of strangulation, which represent 1% of all the homicides. What there's an abundance of evidence of is Ben's drinking. Because for the first time we learned, she's had 14 drinks in seven hours. Now, Ben's drinking deaths- Her client knew that she was intoxicated, yet he doesn't call her for three hours. There's a plan to go to grandma's house to pick up the kids. He doesn't call her. And when he's being interviewed by the police, he never asks what happened to Kate. Where is her body? What's going- Can you just adjust those two? Yes. He does call her. He leaves her. I note that your time is up. But if you would answer this question, and then you will have an opportunity for a reply. So to answer your question, he does call her. He leaves a voice message. Kate, where are you? They're saying something happened to you. He leaves a voice message, okay? He asked about her when he's in the car. We cannot be convicting people in this country on all this speculation about the defendant's behavior. I'm talking about the hard, cold facts of the forensic evidence in this case. And this judge failed to understand and, quite frankly, ignored the electrophysiologist, the trace evidence. He doesn't even acknowledge the cell phone evidence. And that's the basis of why we think there should be a de novo review. The second question is the sufficiency of the evidence. Which you can get to- And I'll answer that for you. Do you have any other questions? No. Any other questions? Thank you. You will have an opportunity. Counsel, do you wish to argue? Yes, ma'am. Good morning, Your Honors, Counsel, members of the audience. May it please the Court, my name is Myles Kelleher on behalf of the people of the state of Illinois. The people proved defendant guilty of first-degree murder beyond a reasonable doubt. As this Court is well aware, in determining the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Now, contrary to all the arguments you just heard from the defense, there is ample evidence that Kathleen King's death was a homicide, and there is ample evidence that defendant was the person who killed her. Well, the defendant argues that we should review this case in a different light because of the new expert testimony that was offered in the case, particularly the cell phone expert who testified regarding the pings that came from Kate's phone. Can you address that? Yes, Your Honor. The ping evidence does not help the defense. In fact, it's entirely consistent with the people's theory that defendant was strangled at her home, where she and defendant lived, and then transported to the railroad tracks where the body was staged to make it appear as if she had been out running and had some type of accident or medical problem. Well, the defendant's theory is that... Go ahead, I'm sorry. Yes, the first ping was at 623 a.m. in the vicinity of the home. Second ping was at 634 and that ping actually had a margin of error of 165 meters, which if you look on the map, that encompasses an area right on the edge of Esping Park, the eastern, it would be the eastern edge of the park. So it's entirely consistent that that defendant could have had Kathleen's body with Kathleen's phone on the eastern edge of Esping Park or right around the edge of the Johnson Control property and then would have had sufficient time to bring the body to the tracks where the body was found. Now, this is very significant. If Kathleen could have been in the vicinity of the two ping locations while she was alive, then defendant could have been in those very same locations with Kathleen's phone and with her dead body. That's logic. The defense is saying Kathleen had her phone in those locations while she was alive while those two pings occurred. If she could have been in those locations, so could have defendant. And we know defendant had Kathleen's phone. He admitted it. He took her phone at 4 a.m., approximately 4 a.m., and that's when the tipping point happened. They were having marital problems. Kathleen returned from Army Reserve in early June, and defendant found out she was involved in a relationship. She met a man called Billy Keough, and Kathleen was texting numerous times every day, and it was bothering defendant. It bothered defendant so much to the extent where a few days after she returned, they were visiting his father downstate. He took her phone, threw it into a pond. He called it her damn phone because he was so upset that he was texting so much. And according to Brandon's testimony, he also was yelling, F-U, Kate. Yes. That was the same trip downstate when he chucked the phone into the pond. Yes, that's correct. And we don't know how many text messages are on that phone because that's at the bottom of a pond. He told the police that he wasn't checking on Kate, but in fact he was checking on Kate. Yes. What we do know is Kathleen bought a new phone two days later, and in the next three weeks prior to her death, forensic extraction from that phone showed that she and Keough had made 3,499 text messages between each other, between the two phones. So that's averaging over 150 texts a day, and defendant was aware of that. And he pursued defendant. He did electronic searches. He, you know, went to, was searching Billy Keough. He went to his Facebook page. He was becoming more and more obsessed. You know, go ahead, I'm sorry. So I just wanted to talk about the evidence at the track, train tracks. This was less than a quarter mile from her house. Kathleen's body, defendant claims that he last saw Kathleen as she was going out for a run. At 6.38 a.m., Kathleen's body is found on an active railroad track. Her body is in a twisted, unnatural position with her neck draped over the rail, as if her head had been placed on a guillotine. And now Kathleen was an avid runner. She had regular running routes. She would go run by the river, in the park. But her son, Brandon, testified that Kathleen would never run on the railroad tracks. And two train engineers testified that in all their years driving trains past the same location, they had never seen anyone running on those tracks. And why would a runner run on railroad tracks with loose ballast rocks, especially an avid runner like Kathleen? And in her closing argument at the trial, Ms. Zellner argued that that's all true. But Kathleen's appearance, Kate's appearance, was all attributable to the fact that she was highly intoxicated and that that's the strange appearance, the dress, the bra, the no contacts, no underwear, the leaf fragments, her cell phone band not wearing that, and the odd posture of the sock were all attributable to intoxication. Is that a reasonable inference? No, Your Honor. The trial court was entitled to reject defendant's theory that defendant died of, I'm sorry, Kathleen died of sudden cardiac arrhythmia caused by binge drinking. Trial court heard all this evidence. He heard the state's witnesses. He heard the defense witnesses. And the trier of fact is not obligated to accept or search out any possible explanation consistent with defendant's innocence. The trier of fact, which was a judge in this case, was entitled to make his own credibility determinations. And he determined that both Dr. Smock and Dr. Kalliker provided credible testimony that Kathleen King was strangled to death. Counsel, can you address the defense argument that there are discrepancies between the cause of death testimony from Smock and Kalliker? Yes, Your Honor. There was, there were some minor discrepancies between their testimony, but they did agree on the main points as to the the petechial hemorrhages to Kathleen's eyes, the laryngeal and epiglottic that led both of them to conclude that this was a case of strangulation. Now, there were some, you know, disagreements as to some of the, you know, more minor potential injuries on her body, the redness to the face on the neck. But just because two witnesses have some inconsistencies in their testimony doesn't mean that they both can't be credible as to the ultimate conclusions that this was a case of strangulation. And again, this is, this was up to the trial court. The trial court here was the finder of fact. It was up to the trial court to determine the credibility to witnesses, to weigh the evidence, to draw reasonable inferences, and to resolve any conflicts in the case. And the trial court did. The trial court was well argued though that the trial court did not consider all the competent evidence. There's absolutely no reason to conclude that the trial court didn't consider all the, all the evidence in this case, the admissible evidence. Just because the trial court doesn't mention every single piece of evidence in their finding doesn't mean that they didn't consider it. The trial court is presumed to consider all the evidence. In a jury trial, the jury renders its verdict. It doesn't explain anything. This trial court could have just said, I find the defendant guilty. The trial court went on, explained its findings, and whether or not, you know, it was entirely perfect, if he made one little mistake here or there, that's fine. That's, that's harmless error. That didn't affect the outcome of the case. But the trial court did its job properly, presumed that court only considered competent evidence, and it was up to the trial court to make this determination. The defendant here waived his right to a jury, requested a bench trial, so the judge was the trier of fact. The defendant here has a theory of the case, but the defendant is not the trier of fact. The judge was the trier of fact. And this is, even though this was a very complicated case with numerous witnesses, lots of evidence, in many ways it's just like thousands of other cases where a defendant, the State presents one theory, the defendant presents another theory, and it's up to the trier of fact to determine which theory to believe, and whether the State met its burden of proving beyond a reasonable doubt that the defendant was guilty. That's exactly what happened in this case. Counsel, how about the trace evidence on the shoes? Do you want to address counsel's arguments on that? Yes, Your Honor. First of all, the very word trace means you're talking about a minute substance, and as Justice Burkett mentioned, Kathleen's shoes at the scene were relatively clean. There was just a tiny amount of dirt, dry dirt, on them, whereas many of the first responders had mud on their shoes, they had this other reddish-brown substance from the ballast rock, and her shoes were remarkably clean, except for a little dry dirt. Go ahead, I'm sorry. As far as the trace elements that were found, the defense expert Pelinek did not rule out the possibility that the scuff mark and the trace particles could have been transferred onto Kathleen's shoes while defendant was placing her body onto the tracks. And one can make a reasonable inference that when defendant transported her body to the scene, probably wrapped in the comforter that was found damp in the washing machine at home, he lowered her body to the ground, her feet hit the ground, feet first, possibly the rail, the ballast rocks, got a small amount of trace elements on there, and then he positioned the body so that her head would be strategically placed right over the rail with the hope that an oncoming train at some point would hit the body, thereby destroying the evidence of the assault and her strangulation. Dr. Bloom theorized that Kate's, the injuries under her chin, to the neck, were the result of somehow touching the rails before Kate was finally, does that, is that a reasonable inference? Your Honor, the... Or is it speculation? Dr. Calicur disagreed with that finding. Dr. Calicur found that the abrasions under the chin were more circular in nature and were inconsistent with falling on a rail. And again, even if there are two different competing theories as to how Kathleen sustained that injury, again, this was up to the trier effect. Just like the trier effect has to make all types of factual determinations. That's why we have trials, because oftentimes the state and the defense don't agree on certain facts. That's why the trier effect is tasked with the job of assessing all the evidence, determining how much weight, if any weight, to give to any particular piece of evidence, and what significance it has, and whether it's credible evidence. And that's exactly what the trial court did. So as far as that particular injury, that's just one of all the injuries the trial court could consider. And that's what the trial court did here. Counsel, I have one question. Would you address the PEA argument, the activity from the heart? Yes, Your Honor. First of all, there was an abundance of evidence that when the trained personnel and all the first responders came to the scene where the body was located, Kathleen was dead. And it was clear that she had been dead for some time, because there were signs of lividity setting in. And these were experienced first responders. They knew it was obvious that she was dead. Now, they did... In addressing that, also, what about the one trained employee who saw her shirt move and thought it was a breath? Well, that was from a distance, Your Honor. And I would just point out, from a distance, he also thought Kathleen was decapitated. When he got closer, he realized, no, it was breezy. The wind had blown her shirt. But he even acknowledged, once he got closer, it was an apparent death. But just to respond to Justice Jorgensen's question about the PEA, they did put an EKG on her. And it did show what's called pulseless electrical activity. But there was absolutely no... The heart was not beating at all. And that's a phenomenon that occurs even after a body that is dead. There can still be some electrical activity coming from the heart, even though the heart has stopped beating. It doesn't mean that the person's still alive. It doesn't mean the person can be resuscitated. It's just, you know, one of those odd phenomenas that happens after someone dies. And that's the significance of that in this case. And there's absolutely no evidence that Kathleen was alive at the tracks. And the whole time of her death was irrelevant. I mean, if someone strangles someone, it doesn't matter if that person dies two minutes later, two hours later, two days later. It's still a murder. So this is really a red herring as far as whether she was alive or not at the tracks. All the evidence, overwhelming evidence, was that she was dead at the tracks. And the reasonable inference is that the defendant strangled her at the home, wrapped her in the comforter, transported her body to the tracks, and staged it so that it looked like she was out running Why anyone would be running on a track, that's unreasonable. But the reason he picked that location was so a train could strike the body. If he wanted to, he could have picked a secluded location like by the Fox River, but then you wouldn't have a train that could potentially destroy the evidence. If he dumped the body by the Fox River, then once the body's discovered, they can see. They can do a forensic autopsy and see, oh, she was strangled to death. If a train destroys the body, potentially all that evidence would be gone. I did have one quick question. Was there any evidence in the record to dispute the timing of the pings and the location or radius of those pings? Your Honor, even if the expert testimony is completely accurate as to the timing of the pings, it's perfectly consistent with the state's theory of the case. And as to the first ping, it's important to note that she may have been dead for 10, 15 minutes before the first ping went off. All a ping does is tell you where the phone is located. The user doesn't have to be using the phone, and it doesn't tell you who has possession of the phone. Just because the phone pinged doesn't mean it was in Kathleen's possession. Actually, there's evidence here that defendant took possession of her phone shortly after 4 a.m. and kept that phone in his possession until he carefully placed it on the tracks against two railroad spikes, which is totally inconsistent with how a phone would end up if someone was holding it in their hands and had a medical emergency or tripped on a ballast rock. Dr. Bloom theorized that she placed it there as she was experiencing the cardiac event. Yes, and this is the Dr. Bloom who the trial court found whose testimony was not credible. Trial court was free to find Dr. Bloom's credible, I mean testimony and credible, and ask exactly what the trial court did. Dr. Bloom had all types of theories. That doesn't mean they're credible. And it was up to the trial court again. All right, anything else? Counsel, your time has expired, and if you would want to take just a moment to sum up your position. Just in summary, defendant had, I'm sorry, defendant had the theories that the defense had advanced in this case. They're all debunked by the other evidence in this case. The Ping evidence does not exonerate defendant in any way. If anything, it's consistent with the state's case. It supports the reasonable inference that defendant killed Kathleen at the home, transported her body to the railroad tracks, and staged it to look like an accident. So for all of these reasons, as well as those in our brief, the people respectfully ask that this honorable court affirm defendant's conviction for first-degree murder. Thank you. Thank you. Do you wish to reply? So I think counsel stated that the Ping is east of where the body's found. That's where the Johnson Control Building is. That's what you can't access by a vehicle. That's why Kate went through there, and she's got leaves in her hair because she cut through there. So he's just admitted that the Ping was east of where the body was found. It makes no sense that Mr. King would drive his vehicle, because he drove a vehicle. He didn't carry her from the house. How do we know that? He was six foot four, 275 pounds. That he carried her deceased body from his home a quarter of a mile away, down the sidewalk, across the park. I mean, I think being able to visualize the scene is important. There were people out walking their dogs. There were people doing things. As you said, they didn't see either one of them. But there was nothing that connected Mr. King to the scene. No mud, no tracks, nothing. She came through the Johnson Control Building on foot. And this thing with the trace... It's interesting, because didn't the record show that there were signs, cameras, but actually the cameras weren't. There were no cameras. Yes. Yeah, tragically the cameras weren't activated. But imagine... So wouldn't that provide... Oh, sorry. Let me finish this up. Wouldn't that provide someone carrying a body to be alarmed by the sign that this is under surveillance, so you move down the track to place the body? Precisely. And so you shouldn't have the cell pinging up there by Johnson Control when it was. The second point is when he talks about Mr. King stalking Kate, when they had the pond incident with the phone being thrown, he and she went and bought phones the next day. He had had the experience in his first marriage of his wife cheating on him. They got a divorce. He was the one who sent Kate the divorce note, which was entered into evidence, that said, you know, let's just try to figure out a reasonable visitation schedule for the children. I'm going to support you in what you do, and you're going to do great things. That's what he wrote to her. This is not an aggressive, violent person. Her family said they'd never seen him lose his temper. Do we know that that note was written before Kate's death? How do we know that? Because of his statement, right? No, because it was, it was found in her duffel bag. Yeah. How do we know that he didn't plant that? There's no evidence that he planted it, and it seems relevant to the time where she told him she didn't want a divorce. There's evidence that he concealed things. There's evidence that he lied to the police. His, what you construe as his lies, he also denied committing the crime 162 times. They also did not play the beginning of the interrogation tape for the judge. We had to call them out on that where he's sobbing. The state put on the interrogation tape and didn't play the beginning. There's no question they planted the wood shard in the bathroom trying to claim there was destruction at the house. We are not, we try the defendant. Our job is to look at all of the evidence and determine whether or not the proof was sufficient to convict. But the argument is not just the sufficiency argument. It's the things I raised prior about the shoes, the trace evidence. There was no concession by Mr. Palnick that the abrasions and the scuff mark on the shoe were caused by anything other than her walking on the ballast rocks by the tracks. I want to address this issue of the great discrepancies between Dr. Smock, who in many ways stepped in for Mr. Safaric in the case. They had to shore up Dr. Calicar's testimony. That's why they brought him in, because Dr. Smock had never performed an autopsy. He's a police sergeant, and he'd written or edited a book on nonfatal strangulations and had to admit that many of the pictures in his book of victims with petechiae who had survived the strangulation were far worse than what Kathleen had. But some of the things they disagreed on, Calicar and Smock disagreed on whether it was a manual strangulation. He said yes. She said no. He said this was a suffocation. She said suffocation, the technical term is smothering, and it was not a suffocation. He said the chin bruises were part of strangling her, that pushing on the chin where those bruises were, that that cut off her windpipe. And that was one of the findings the judge believed, which is just not credible, as they said in the cases that have reversed bench trials, when it becomes fanciful and improbable. Dr. Bloom correlated the chin bruise with the saw-tooth marks on the tracks. She had rust on her chin, she had brown on her chin, and she had the particles. Her chin had been on the rail in exactly where the bruises were, but the chin marks had nothing to do with strangulation. That was another of Dr. Smock's theories. Dr. Calicar not only said this wasn't a manual strangulation, but she said there were no injuries on her body that were not antemortem, that couldn't have resulted from the fall, except for the inner arm bruise. And we found in the state discovery a picture of Mrs. King 48 hours before she died. It was a selfie that was taken, or Mr. King took it, but she's very much alive. She's got an inner arm bruise. That's the only finding that wasn't correlated with her collapsing at the tracks. Fifteen minutes later there are photographs of her showing her arm that do not show that bruise. The angle of those photographs, you couldn't have seen the bruise, the way her arm was positioned. There also, as I mentioned earlier, was a blade of grass on her shoe. On the PEA there was a triple board certified electrophysiologist who's never testified before as an expert from Vanderbilt that described PEA exists in people that are alive, they are not brain dead. And he said that the timing of PEA, in his experience of hundreds of cases, can last about 40 minutes. Well, she'd been up on the tracks for 34 minutes, okay, and that she had organized her activity. She was alive, she collapsed. Something else we haven't talked about is the vomit on the tracks. Dr. Bloom was able to correlate the piece of emesis on the tracks with her stomach contents. It was a nacho. That she ate six hours before. Right. Dead people don't vomit. So she was very much alive on the tracks. The Supreme Court, before we brought all of these new experts, said the evidence of guilt in this case is not overwhelming. You don't have a confession. You don't have any forensic evidence of, you know, the injuries to her. You have some circumstantial evidence. And the last part... Is there a distinction between circumstantial evidence and direct evidence, in our view, as to the way a trial court weighs the evidence? There's no legal distinction, is there? Interesting question. I don't think there is. I mean, this was a circumstantial evidence. And here's the circumstantial evidence that Kate was killed somewhere else and transported included all of the things that you argued were all explained away by intoxication. But it's also reasonable that maybe she was strangled and placed on the tracks, because she didn't wear her typical attire. She didn't have her running band. She didn't have her contacts in. She didn't wear any underwear. There were fragments, leaf fragments, not just in her hair, but just above her genitalia, in her loose-fitting running shorts that are untied. I mean, just, it goes on and on. Well, let me address... There's dozens of inferences. The leaves are all over the house. They're in the shorts, her shorts, on the bathroom floor. They've got leaves everywhere, in their bed, in their washing machine. It doesn't mean anything that she had some leaves on her body. I don't think that evidence, compared to the scientific evidence in this case, that she was walking, she was alive, she vomited. And she'd had 14 drinks. And on June 26th, what was so important to the electrophysiologist was she had what he believed was an arrhythmic experience that could have been fatal when she was in a bar with her husband and another couple. And she had a few drinks and became... She could not walk to her car. And she vomited when she got home. And her sister addressed that. So what the cardiac electrophysiologist shed on the second trial that did not exist in the first trial is binge drinking. So binge drinking causes a metabolic derangement of the electrolytes around the heart. And it is... Doesn't that also make the assumption, though, that she was not a regular drinker? And it appeared that, based on her family's testimony, that she was. This is what the testimony, and that is a very good point because the state raised it. So what we know is she wasn't drinking when she was in the Army. When she came home, she bought some bottles of wine. And according to Mr. King, she was drinking more. But according to the electrophysiologist, that's not what's relevant. What's relevant is what did she drink on July the 5th at the bar? And what he zeroed in on were the, not only the, in the 14 drinks, were the two shots of fireball whiskey. And it's the mixture of beer, wine, and then shots of hard liquor that he says is well-documented can trigger an arrhythmic death. And it's not common in colleges for that to happen. But he referred to chronic alcoholics not being susceptible. Questions? Your time has expired. If you would take just a moment to sum up your position. So our, the position is that this case should be reversed outright on the insufficiency of the evidence because from the first trial, many of the things that were questioned have now been resolved. Kate was alive. She did walk to the track. She was severely intoxicated. We now know how much she was intoxicated. And she collapsed on the track. She vomited. And that's how she died. And that is tragic, but that is not a murder that should be attributable to Mr. King. The second thing that's extremely important is the staging. The State couldn't connect Mr. King by any forensic evidence to the case and neither could the judge. If you look at the judge's findings, five of the seven findings where he finds him guilty beyond a reasonable doubt have to do with staging, that he bought into staging. I can only find two cases in Illinois on staging. One of them was Jesse Smollett. And in that case, the witness admitted he had staged, helped stage a hate crime. This is a rare, unusual theory and there is no support for it in light of the forensic evidence that we have presented. So the judge made a series of mistakes. He came up with his own motive that it was because Mr. King wanted a divorce. That was nothing the State had raised. But the evidence is wholly insufficient under Jackson v. Virginia. First, that there was a but secondly, that he's connected to it. The only thing they got is this theory on staging, which their own expert, Dr. Calicar, said that there was, in her mind, everything was attributable on her clothing to her being so intoxicated. But most importantly, what refutes the staging and what the trial judge ignored is two officers at the scene, Officer Hahn and Officer Montgomery, denied there was any evidence of staging. Denied, the State's witnesses. Staging is, and the Supreme Court said in their opinion in this case, that there was plenty of circumstantial evidence for an inference of staging. And that's why expert testimony was not admissible, because common sense dictates that there was staging. Correct. But that's before we had the admissions in the second trial. That's before we knew the intoxication level. That's before their own expert admitted it could all be explained by her being intoxicated. And that's before these two officers admitted there was no staging. That's all that connects him to the crime. So thank you. It's always an honor to appear before this court. Thank you. Thank you both very much for your arguments this morning. And that concludes the two cases set on our call here this morning. And it will conclude our recording of the evidence and the arguments, excuse me. With that, though, on behalf of the court, I want to say thank you very much for coming and showing interest in what our appellate courts do and to hopefully shed some light on what happens after a trial. So we'll be back in a few minutes for questions and answers. And graciously, both counsel have agreed to stay and also participate.